## No. 21769.

THE WESTERN FIRE INSURANCE COMPANY, A KANSAS CORPORATION *v*. THE FIRST PRESBYTERIAN CHURCH, LITTLETON, COLORADO.

(437 P.2d 52)

Decided February 5, 1968.     Rehearing denied February 26, 1968.

BLUNK & JOHNSON, for plaintiff in error.

SHOEMAKER & WHAM, RICHARD PLOCK, for defendant in error.

*En Banc.*

MR. JUSTICE MCWILLIAMS delivered the opinion of the Court.

THE First Presbyterian Church of Littleton, Colorado, hereinafter referred to as the insured, filed a claim for relief against The Western Fire Insurance Company, a Kansas corporation, hereinafter referred to as the Company. The insured's claim was based on a certain contract of insurance issued the insured by the Company. Trial by jury culminated in a judgment for the insured against the Company in the sum of $21,404.83, and by writ of error the Company now seeks reversal of the judgment thus entered against it.

The central issue here to be resolved is whether the insured suffered a "direct physical loss" within the period of coverage provided for by the insurance con-

tract. Before summarizing the evidence adduced at the trial of this matter, reference should first be made to certain terms and provisions contained in the insurance contract between the parties.

On March 16, 1963, the Company issued a policy of insurance to the insured covering, among other things, a certain church building located in Littleton. It should be noted that the insured had carried insurance on this church building prior to March 16, 1963, and the particular policy of insurance with which we are here concerned was issued as the result of a consolidation of several policies of insurance theretofore carried by the insured on not only the church building, but also the manse and two other church buildings. In the policy issued on March 16, 1963, the value of the church building was declared to be $320,000. The policy thus issued was one claimed to be specially designed for "public and institutional property," and it not only contained an "Extended Coverage Endorsement" but also contained that which was denominated by the Company as a "Special Extended Coverage Endorsement." As concerns coverage, the Special Extended Coverage Endorsement provided that "in consideration of the premium for this coverage . . . THIS POLICY IS EXTENDED TO INSURE AGAINST ALL OTHER RISKS OF DIRECT PHYSICAL LOSS, EXCEPT AS HEREINAFTER PROVIDED."

As noted above, the inception date for this policy of insurance was March 16, 1963. At the outset of the trial a part of the pre-trial order was read to the jury as being a "stipulation" between the insured and the Company. By this stipulation the parties agreed that on March 28, 1963, the insured acting upon the orders of the Littleton Fire Department closed the church building "because of the infiltration of gasoline in the soil under and around the building, which gasoline and vapors thereof infiltrated and contaminated the foundation and halls and rooms of the church building, making the same unin-

habitable and making the use of the building dangerous."
As stated above, trial by jury resulted in a verdict in
favor of the insured in the sum of $21,404.83, which sum
represented the cost of remedying the infiltration and
contamination problem. No complaint is here made re-
garding the amount of damages thus awarded. Rather
it is the basic position of the Company that as a matter
of law the trial court should have directed the jury to
return a verdict in its favor. More specifically, the Com-
pany now contends that: (a) the insured did not suffer
"a direct physical loss" within the meaning of that
phrase as such is used in the Special Extended Coverage
Endorsement; or that (b) if the insured did sustain such
a loss, the loss in such event did not occur *subsequent*
to the inception date of the policy, namely March 16,
1963.

In connection with this latter contention, at least a
brief recital of certain background information estab-
lished upon trial is in order. And, as we see it, the
testimony concerning this phase of the case is not in
any real dispute. During January and February, 1963,
several persons noted a strange odor in the vault located
in the basement of the church. Investigation by church
officials, as well as Public Service Company employees,
failed to establish with any degree of certainty the
exact cause of the odor. Some thought it was a gaseous
odor. Others thought it was caused by a dead rodent,
or stationery ink, and so on. Nor was there anything to
indicate that there was any danger of explosion con-
nected with this odor, whatever it was. Tests to detect
the presence of flammable vapors generally proved nega-
tive, though in one instance where the test did show
the presence of some flammable material, the quantity
thereof was said to be below the "explosion level." And,
in any event, the odor problem was considered to have
been "solved," at least momentarily, in mid-February,
1963, when a leak in a joint in a natural gas line was
discovered and fixed.

Quite admittedly then, there was evidence of a strange odor in the church vault prior to March 16, 1963. In this regard it should be mentioned, however, that though the Company originally pled misrepresentations and concealment on the part of the insured, these affirmative defenses were voluntarily withdrawn by the Company at the conclusion of all of the evidence. The Company in its brief emphasizes that it does not now suggest any "bad faith or concealment on the part of the insured."

Rather, as indicated above, the basic contention advanced here by the Company is that the insured sustained no "direct physical loss" after March 16, 1963. The argument, as we understand it, runs somewhat as follows:

1. this is not a "loss of use" policy, as such, and hence the mere "loss of use" of the church premises occasioned by the "closing down" of the building by the fire authorities is not covered by the policy, as such does not constitute a "direct physical loss";

2. if there was any "direct physical loss" sustained by the insured, it consisted of the "infiltration and contamination of the premises by gasoline";

3. that the insured failed to establish that such infiltration and contamination of the premises occurred on or after March 16, 1963; and

4. that, on the contrary, the infiltration of gasoline onto the premises quite obviously antedated the inception date of the insurance policy, i.e., March 16, 1963.

With this general line of reasoning we do not agree. It is perhaps quite true that the so-called "loss of use" of the church premises, standing alone, does not in and of itself constitute a "direct physical loss." A "loss of use" of course could be occasioned by many different causes. But, in the instant case, the so-called "loss of use," occasioned by the action of the Littleton Fire Department, cannot be viewed in splendid isolation, but must be viewed in proper context. When thus con-

sidered, this particular "loss of use" was simply the consequential result of the fact that because of the accumulation of gasoline around and under the church building the premises became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous. All of which we hold equates to a direct physical loss within the meaning of that phrase as used by the Company in its Special Extended Coverage Endorsement insuring against "all other risks."

We also are of the firm view that the direct physical loss thus sustained by the insured did occur within the policy period of the insurance contract. No doubt the chain of events which eventually resulted in a direct physical loss to the insured did start prior to March 16, 1963, but this does not mean that the actual "loss" was also incurred prior to March 16, 1963. Our analysis of the instant case leads us to conclude that there was no direct physical loss sustained on, for example, the first day that gasoline actually seeped onto the insured's premises. To the contrary, no direct physical loss was incurred by the insured until the *accumulation* of gasoline under and around the church *built up* to the point that there was such infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable and make the continued use thereof dangerous. There is nothing in the record to indicate that *prior* to March 16, 1963, the church building was rendered uninhabitable and the continued use thereof highly dangerous because of the infiltration and contamination of the church building. On the contrary, the evidence indicates that such infiltration and contamination was first determined only about a day or two prior to March 28, 1963, and that the premises were then closed on March 28, 1963, upon order of the Littleton Fire Department. And the stipulation referred to above also recognizes that it was only on March 28, 1963, that the church building was closed because of the aforementioned infiltration and

contamination of the very foundation, walls and rooms of the church building.

In short, we hold that on what we deem to be the virtually undisputed evidence, the insured established that there was a direct physical loss occasioned to the church building within the policy period of the insurance contract. Such brings the insured within the "all risk" coverage provided by the Special Extended Coverage Endorsement.

Our attention has not been directed to any Colorado decision bearing on this particular point. Of the outside authorities brought to our attention, *Hughes v. Potomac Insurance Company,* 199 Cal. App. 2nd 239, 18 Cal. Rptr. 650, presents perhaps the most analogous factual situation. There, as the result of a series of heavy rains, there was a gradual buildup of water pressure, or ground water, which eventually caused a landslide to the end that the "backyard" of the insured's dwelling slid into a creek, leaving the house proper perched precipitously on the edge of a very newly created cliff. The house itself, however, suffered no tangible injury, as such. The policy in the *Hughes* case was like the policy in the instant case, and insured against all risks of physical loss and damage to the dwelling. There, as here, it was contended that the insured suffered no direct physical loss. In rejecting this argument the First Appellate District of the California District Court of Appeals made the following pertinent comment:

"To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been 'damaged' so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense re-

quires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner."

█ The Company argues additionally that there is no coverage because of an exclusion contained in the Special Extended Coverage Endorsement. The particular exclusion relied on provides that the policy does not insure against loss occasioned by "smoke, vapor or gas from . . . industrial operations." The source of the gasoline which accumulated over a period of time under the church building was not established. Located across the street from the church was a filling station, and this circumstance alone certainly made the filling station a rather prime suspect as being the fountainhead of the runaway gasoline. But, as just stated, insofar as the evidence adduced at trial is concerned, there is nothing in this record other than strong suspicion tying the filling station in as the origin and source of the gasoline which drained in, under and around the nearby church building. Such then being the state of the record in this regard, we need not here concern ourselves with whether "gasoline" is "gas," or whether a retail filling station is an "industrial operation." It is sufficient to say that under the circumstances the trial court did not err in refusing to submit to the jury the question as to whether this particular exclusion had applicability.

█ Finally, the Company assigns as error the several rulings of the trial court on instructions, the Company contending that the trial court erroneously submitted certain instructions to the jury, and on the other hand erred when it refused to give several instructions submitted by the Company. As indicated above, as we view the matter there really were no genuine issues of fact relating to the issue of liability which required submission of the case to the jury. At the conclusion of the evidence each side moved for a directed verdict in its favor on the issue of liability. And in the last analysis this entire controversy boils down to a determination

as to whether the insured sustained a direct physical loss within the policy period of the insurance contract. It seems to us this was a question of law and not one of fact, and that under the circumstances the trial court should have granted the insured's motion and permitted the jury to fix the damage sustained by the insured. Such being the case, then, we need not now examine *in minutiae* the several instructions relating to the issue of liability about which complaint is here made.

However, perhaps out of an abundance of caution, the trial court denied both motions for a direct verdict and submitted all issues to the jury. And in our view the jury was adequately and properly instructed as to the law of the case. Even assuming there were issues of fact concerning liability which had to be resolved by the jury, we still perceive no prejudicial error as to instructions either given, or refused.

The judgment is affirmed.

Mr. Justice Hodges dissents.