In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 21-1186

SANDY POINT DENTAL, P.C.,

*Plaintiff-Appellant*,

*v.*

THE CINCINNATI INSURANCE COMPANY,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20 CV 2160 — **Robert W. Gettleman**, *Judge*.

———————————

No. 21-1559

THE BEND HOTEL DEVELOPMENT COMPANY, LLC,

*Plaintiff-Appellant*,

*v.*

THE CINCINNATI INSURANCE COMPANY,

*Defendant-Appellee*.

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20 CV 4636 — **Elaine E. Bucklo**, *Judge*.

————————————

No. 21-1203

TJBC, INC.,

*Plaintiff-Appellant*,

*v.*

THE CINCINNATI INSURANCE COMPANY,

*Defendant-Appellee*.

————————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:20-cv-00815-DWD — **David W. Dugan**, *Judge*.

————————————

ARGUED SEPTEMBER 10, 2021 — DECIDED DECEMBER 9, 2021

————————————

Before MANION, WOOD, and HAMILTON, *Circuit Judges*.

WOOD, *Circuit Judge*. No one doubts that the COVID-19 pandemic has inflicted enormous losses on businesses, large and small, throughout the country. It is therefore not surprising that an avalanche of insurance claims has followed in the wake of the pandemic, as the suffering businesses look for assistance in absorbing those losses. We resolve three such claims in this opinion—those brought by plaintiffs

Sandy Point Dental, P.C. ("Sandy Point"), the Bend Hotel Development Company ("Bend Hotel"), and TJBC, Inc. ("TJBC"). We refer to the plaintiffs collectively as the Businesses unless the context requires otherwise.

Each Business was required to close or dramatically scale back its operations in response to a series of executive orders issued by Illinois Governor J. B. Pritzker in an effort to curb the spread of the virus in the state. The Businesses held materially identical commercial-property insurance policies, sold by the same insurer, the Cincinnati Insurance Company ("Cincinnati"). In brief, these policies provided coverage for income losses sustained on account of a suspension of operations caused by "direct physical loss" to covered property. The policies also provided coverage for income losses sustained as a result of an action of civil authority prohibiting access to covered property, when such action was taken in response to "direct physical loss" suffered by other property.

Each Business filed claims for coverage under its policy, and each time, Cincinnati denied the claim and litigation ensued. In all three cases, the responsible district court granted Cincinnati's motion to dismiss for failure to state a claim upon which relief could be granted. See FED. R. CIV. P. 12(b)(6). Each court reasoned that the Business before it did not adequately allege that either the virus that causes COVID-19, SARS-CoV-2, or the resulting closure orders caused "direct physical loss" to property. All three Businesses appealed; we resolve those appeals in this consolidated opinion.

Our review is *de novo*, but we find little to criticize in the district courts' resolutions of these cases, and so we affirm the judgments of dismissal. In doing so, we join the four circuits that so far have addressed the central question before

us: whether loss of use, unaccompanied by any physical alteration to property, may constitute "direct physical loss" under the relevant insurance policies. See *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398 (6th Cir. 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 15 F.4th 885 (9th Cir. 2021); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, --- F. App'x ---, 2021 WL 3870697 (11th Cir. Aug. 31, 2021).

## I

On March 15, 2020, in response to the rapidly expanding COVID-19 pandemic, Governor Pritzker issued an order mandating the temporary closure to the public of restaurants, bars, and movie theaters. Exec. Order No. 2020-07. On March 20, 2020, he issued another order, this time requiring all non-essential businesses to shut down partially and temporarily. Exec. Order No. 2020-10.

As a result of these orders, Sandy Point, a private dental group, had to suspend the elective and routine dental services that make up 95% of its business, and limit its practice to emergency services. TJBC, which owns and operates two food and beverage establishments, was required to suspend in-person dining and limit its services to delivery and take-out. This lasted until June 26, 2020, when a superseding order permitted it to serve patrons in an outdoor setting, in parties of six persons or fewer, and in a socially distant manner.

Bend Hotel's allegations are less concrete, and so it is harder to tell what precisely these orders demanded of it. Its complaint alleges only that the first order "prohibited the

public from accessing [Bend Hotel's] restaurants," and that the second order "clos[ed] all 'non-essential' businesses in Illinois, including all restaurants … and much of hotel operations." But as Cincinnati points out, although the orders prohibited in-person dining, they permitted delivery (including room service, in the case of a hotel) and take-away. The second order even designated hotels as essential businesses, "to the extent used for lodging and delivery or carry-out food services." Exec. Order No. 2020-10, ¶ 12.v. Based on the complaint and text of the orders, which are official documents that have legal effect, and thus a proper subject of judicial notice, we proceed on the assumption that Bend Hotel did limit its restaurant services to delivery and take-out, and that its lodging services suffered from reduced capacity caused by restrictions on non-essential travel and social-distancing requirements.

To recover the income losses occasioned by the closure orders, the Businesses turned to commercial property insurance policies sold to each of them by Cincinnati. The relevant provisions read as follows:

> **SECTION A. COVERAGE**.
>
> We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss. …
>
> **(1) Business Income**
>
> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical "loss" to property at a "premises"

caused by or resulting from any Covered Cause of Loss. …

**(2) Extra Expense**

We will pay "Extra Expense" you incur during the "period of restoration":

   (a) To avoid or minimize the "suspension" of business and to continue "operations" …

   (b) To minimize the "suspension" of business if you cannot continue "operations". …

**(3) Civil Authority**

We will pay for the actual loss of "Business Income" you sustain and "Extra Expense" you incur caused by action of civil authority that prohibits access to the "premises" due to direct physical "loss" to property, other than at the "premises, caused by or resulting from any Covered Cause of Loss. …

**SECTION G. DEFINITIONS**

…

**9. "Loss"** means accidental loss or damage.

In other words, incorporating the stated definition of "loss," the Businesses were covered for income losses resulting from direct physical loss or direct physical damage to property. Thus, to survive Cincinnati's Rule 12(b)(6) motion, they needed to allege that either the virus or the resulting closure orders caused direct physical loss or direct physical damage to covered property.

## II

Before addressing the question whether the Businesses adequately alleged "direct physical loss," we first must determine what that phrase means under the Policy. We look to Illinois law for this purpose, because our subject-matter jurisdiction is based on diversity of citizenship, and the parties agree that Illinois supplies the rule of decision. Our task is to predict how the Supreme Court of Illinois would resolve the issue. See *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019).

Under Illinois law, an insurance policy is to be construed as a whole, "giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). Furthermore, "[a] policy provision is not rendered ambiguous simply because the parties disagree as to its meaning." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1004 (Ill. 2010). Rather, an ambiguity exists when the policy language is "subject to more than one reasonable interpretation." *Hobbs v. Hartford Ins. Co.*, 823 N.E.2d 561, 564 (Ill. 2005).

No decision of the Illinois Supreme Court has addressed the precise policy language before us. But we are not entirely without guidance. In *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481 (Ill. 2001), the state's highest court addressed similar language, holding that "the term 'physical injury' unambiguously connotes … an alteration in appearance, shape, color or in other material dimension." *Id.* at 502.

When interpreting "direct physical loss" in other cases involving coverage disputes over COVID-19-related losses, many courts have turned to this language from *Travelers* and concluded that the phrase "direct physical loss," like the language in *Travelers*, requires a physical alteration to property. See, *e.g.*, *Paradigm Care & Enrichment Center, LLC v. West Bend Mutual Ins. Co.*, 529 F. Supp. 3d 927, 935 (E.D. Wis. 2021) ("While *Travelers* does not interpret the exact phrase at issue in this case, the Court finds it likely that, pursuant to the Illinois Supreme Court's interpretation of the terms 'physical injury,' Plaintiffs have not alleged 'physical loss or damage to' their covered premises."). Cincinnati argues that this interpretation is correct, and the district courts in each of these appeals agreed with that position.

The Businesses offer a competing (and more expansive) interpretation. "Direct physical loss," they posit, captures not only physical alterations to property but also loss of use, even loss that is unaccompanied by any physical alteration. They point to two textual clues in support of this reading. First, they argue that the use of the disjunctive in the phrase "direct physical loss *or* damage" suggests that "loss" must mean something different from "damage," lest the policy language be redundant. "Damage," they suggest, refers to a physical alteration to property, while "loss" refers to the deprivation of use or possession. Second, the Businesses argue that the nature of the exclusions demonstrates that the Policy calls for an expansive understanding of "direct physical loss"—one that includes loss of use—and that the absence of a virus exclusion thus means that the loss of use they suffered from the executive orders, or from the virus, is covered under the Policy.

We have no quarrel with the idea that the disjunctive indicates that "loss" means something different from "damage." See ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) (discussing the canon against surplusage). But the Businesses' proposed distinction is neither the only possible reading nor a likely one. The phrase is "direct physical loss or damage." The words "direct physical" are most sensibly read as modifying both "loss" and "damage." But even if they can be divorced from "damage" (and we do not think that they can), they indisputably modify "loss." Any other interpretation would commit the same sin against which the Businesses caution us—namely making surplusage out of the word "physical." Whatever "loss" means, it must be physical in nature. See *Oral Surgeons*, 2 F.4th at 1144 ("there must be *some physicality to the loss* or damage of property") (emphasis added); see also *Mudpie, Inc.*, 15 F.4th at 893 (favorably citing *Oral Surgeons* for the same proposition).

Cincinnati proposes, and many courts have adopted, a reading that better accounts for both the disjunctive and the word "physical": the word "loss" may refer to complete destruction while "damage" connotes lesser harm that may be repaired. See, *e.g.*, *Crescent Plaza Hotel Owner L.P. v. Zurich American Ins. Co.*, 520 F. Supp. 3d 1066, 1069–70 (N.D. Ill. 2021). But because the Businesses' properties were neither destroyed nor damaged in a way that called for repairs, this option does not help them.

The next textual argument presented by the Businesses is equally unavailing. They contend that if "direct physical loss" were limited to physical alterations to property, the Policy would have no reason expressly to exclude things

such as nuclear reactions, radiation, or radioactive contamination, which do not (they assume) cause physical alterations. Why mention a few non-physical possibilities if all of them are already excluded? The presence of these exclusions must mean, the Businesses argue, that "direct physical loss" is more capacious than Cincinnati is willing to admit. And because an exclusion for viruses is conspicuously absent from the Policy whose terms we are interpreting, it follows that the SARS-CoV-2 virus must not be excluded.

The problem with this argument lies in its premise. Every exclusion to which the Businesses can point *does* involve something that causes a physical alteration to property. Take nuclear radiation, which the Businesses present as their clearest example. They contend that "[l]ike COVID-19, nuclear radiation exists in, but does not physically affect, the structure of a building." But they present no basis for that assumption, and as a matter of fact, it appears to be incorrect. See H.K. HILSDORF ET AL., THE EFFECTS OF NUCLEAR RADIATION ON THE MECHANICAL PROPERTIES OF CONCRETE 226 (1978) (reporting on the effects of radiation, including embrittlement, on the physical properties of concrete and other solids).

But we need not wade into a debate about engineering or materials science. The Policy is replete with textual clues that reinforce the conclusion that "direct physical loss" requires a physical alteration to property. As Cincinnati points out, the Policy provides coverage for losses sustained during a "period of restoration," which is defined by reference to "[t]he date [by which] the property … should be *repaired, rebuilt, or replaced*." (Emphasis added.) Without a physical alteration to property, there would be nothing to repair, rebuild, or re-

place. See *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co.*, 503 F. Supp. 3d 251, 256–57 (E.D. Pa. 2020).

It is thus no surprise that the overwhelming majority of courts, including the four circuits that have so far spoken on the issue, have adopted this interpretation of the relevant provisions. See, *e.g.*, *Santo's Italian Café*, 15 F.4th at 401–03; *Oral Surgeons*, 2 F.4th at 1144; *Mudpie, Inc.*, 15 F.4th at 892; *Gilreath*, 2021 WL 3870697, at \*2; *Inns by Sea v. California Mutual Ins. Co.*, --- Cal. Rptr. 3d ---, 2021 WL 5298480, at \*10 (Cal. Ct. App. 2021). Only a small minority of district-court decisions have adopted the Businesses' loss-of-use theory, and they have largely relied on the disjunctive-based argument that we already have considered and rejected. See, *e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800–01 (W.D. Mo. 2020); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 873–74 (W.D. Mo. 2020).

Finding little support from cases dealing directly with the coronavirus, the Businesses direct us to others involving termite infestations, asbestos, and gases. But these decisions are predicated on findings that the policyholders adequately alleged "direct physical loss" (or "physical injury," the language at issue in the termite and asbestos cases), because property was physically altered.

*Posing v. Merit Ins. Co.*, 629 N.E.2d 1179 (Ill. App. Ct. 1994), illustrates the problem with these authorities. At issue there was whether termites, insects notorious for chewing through wood and compromising the structural integrity of buildings, created a "physical injury." *Id.* at 1184. Given that the reason termites pose a problem is that they physically alter property, it is difficult to see how this case helps the Businesses.

Similarly, the reasoning in the asbestos cases indicates that the courts deemed "physical injury" to be present because asbestos causes a physical alteration to property, not because the asbestos leads only to loss of use. See *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930–31 (Ill. 1991); *Board of Education v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–27 (Ill. App. Ct. 1999). Indeed, the court in *Wilkin* all but said as much: "[Insurers] contend that the presence of [asbestos] results only in intangible economic loss. … This court, however, has already found that asbestos fiber contamination constitutes physical injury to tangible property." *Wilkin*, 578 N.E.2d at 931 (citation omitted).

The gas cases are a little closer to the mark, but they too fall short. Gas infiltration might cause loss of use without any accompanying physical alteration. And yet the courts in these cases found that the policyholders had sustained a "direct physical loss." See *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968); *Gregory Packaging, Inc. v. Travelers Property Cas. Co.*, Civ. No. 2:12-cv-04418 (WHW) (CLW), 2014 WL 6675934, at *1 (D.N.J. Nov. 25, 2014); *Matzner v. Seaco Ins. Co.*, No. CIV. A. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Ct. Aug. 12, 1998). This would seem to support the Businesses' contention that "direct physical loss" includes loss of use, even when it is unaccompanied by any physical alteration to property.

But the gas infiltration in these cases led to more than a diminished ability to use the property. It was so severe that it led to complete dispossession—something easily characterized as a "direct physical loss." In all three cases, the courts concluded that the contamination made the premises "uninhabitable," *Western Fire*, 437 P.2d at 55; *Matzner*, 1998

WL 566658, at *3; *Gregory Packaging*, 2014 WL 6675934, at *6, and "unfit for normal human occupancy," *Gregory Packaging*, 2014 WL 6675934, at *3. In other words, the gas infiltration made physical entry impossible, thus barring all uses by all persons.

That distinguishes these cases from the three that are now before us, where—at most—the Businesses' preferred use of the premises was partially limited, while other uses remained possible. Without any physical alteration to accompany it, this partial loss of use does not amount to a "direct physical loss." This is not to say that no circumstances can exist under which a loss of use, unaccompanied by any physical alteration to property, might be so pervasive as effectively to qualify as a complete physical dispossession of property and thus a "direct physical loss." The gas cases present one such scenario: where gas infiltration renders a property completely uninhabitable, it has been physically lost in a meaningful sense, even if only temporarily.

Harder questions arise if we tweak the facts slightly. Assume that a tornado leaves debris around a building, but it is possible to clear a path through it, thereby allowing the owner of the business, the policyholder, to enter the premises to maintain them until operations may resume. Has the policyholder been effectively dispossessed of the property? What if the debris blocks all access to the primary commercial space but not to an adjacent manager's office? No use may be made of the primary space, but productive uses remain for the office space. Has the policyholder been physically dispossessed of at least part of its property, such that it has alleged a "direct physical loss"?

We leave these questions for another day. We raise them only to emphasize that our holding rests on the facts and policy before us. This is enough to dispose of the common arguments the Businesses have raised. We now turn to their individual points.

## III

### A. Sandy Point

In its amended complaint, Sandy Point makes only a single allegation explaining how it suffered a "direct physical loss." This is what it said: "The continuous presence of the coronavirus on or around Plaintiff'[s] premises has rendered the premises unsafe and unfit for its intended use and therefore caused physical property damage or loss under the Policies."

We agree with the district court that this fails adequately to allege "direct physical loss." Sandy Point does not even attempt to describe how either the presence of the virus or the resulting closure orders physically altered its property. It points only to the loss of the property's "intended use." As we have explained, this is not enough. Sandy Point may have been unable to put its property to its preferred (and, we assume, its most lucrative) use. But this is a far cry from the complete physical dispossession of property suffered by the policyholders in the gas-infiltration cases. Sandy Point at all times remained able to perform *some* dental work, and nothing precluded it from using the property for some other non-dental purpose consistent with the closure orders.

We accept that these alternative uses would not have been equally, or even nearly, as satisfying to Sandy Point. But Sandy Point insured its property, not its ideal use of that

property. Having alleged neither a physical alteration to the property nor its equivalent in its amended complaint, Sandy Point failed adequately to allege a "direct physical loss" under the Policy.

Sandy Point also appeals from the district court's denial of its motion for leave to file a second amended complaint. The denial of such a motion is typically reviewed for an abuse of discretion, but "when the basis for denial is futility," as it seems to have been here, "we apply the legal sufficiency standard of Rule 12(b)(6) to determine whether the proposed amended complaint fails to state a claim. … Accordingly, our review for abuse of discretion … includes *de novo* review of the legal basis for the futility." *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015) (citations omitted).

Even under this standard of review, we fail to see how Sandy Point's proposed new allegations would change the outcome. Sandy Point proposed to add the allegation that "COVID-19 physically attaches itself to the physical premises, and thereby deprive[s] plaintiff of the use of said premises." It supported this contention with allegations regarding how the virus SARS-CoV-2 is "transmitted by air and surfaces through water droplets, aerosols, and fomites."

But these allegations do not cure the deficiencies of the first amended complaint. Even if the virus was present *and* physically attached itself to Sandy Point's premises, Sandy Point does not allege that the virus *altered* the physical structures to which it attached, and there is no reason to think that it could have done so. While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential:

deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days. We thus find no reversible error in the district court's denial of Sandy Point's motion for leave to amend its complaint.

Nor do we find an abuse of discretion in the district court's decision to deny reconsideration of its orders. See *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 628 (7th Cir. 2020) ("[w]e review a district court's denial of a Rule 59(e) motion for reconsideration … for abuse of discretion."). Sandy Point's motion for reconsideration was premised on a single new district court decision that it characterized as a "change in the law" that warranted reconsideration. But that decision is non-binding, and in addition, it did no more than follow *Studio 417*, another district court decision that the district court had considered and rejected.

## B.  Bend Hotel

Bend Hotel's complaint suffers from many of the same deficiencies as Sandy Point's. Like Sandy Point, Bend Hotel alleges that "[t]he continuous presence of the coronavirus on or around Plaintiff'[s] premises has rendered the premises unsafe and unfit for its intended use and therefore caused physical property damage or loss under the Policies." It further alleges that Governor Pritzker's closure order "was made in direct response to the continued and increasing presence of the coronavirus on property or around Plaintiff's premises."

Like Sandy Point, Bend Hotel has not alleged that the virus (or the resulting closure orders) physically altered its property. It has alleged only that the physical presence of

SARS-CoV-2 on its property "rendered the premises … unfit for … its intended use." But, like Sandy Point, Bend Hotel has not alleged loss of use so substantial as to amount to a physical dispossession of its property. Although its allegations are vague, we gather that at least some of its hotel operations remained usable and that, although in-person dining at the hotel restaurant was prohibited, room service and take-out were possible. As in Sandy Point's case, this is a far cry from the complete physical dispossession of property suffered by the policyholders in the gas-infiltration cases. Bend Hotel thus has failed adequately to allege a "direct physical loss" to property.

## C. TJBC

TJBC's complaint made similar allegations and thus fares no better than the other two we have discussed. It alleged that "[SARS-CoV-2] droplets can … attach to surfaces" and that the virus "can survive on solid surfaces for significant periods of time [and] can be spread long distances through the air." It further alleged that four different executive orders issued by Governor Pritzker limited its business operations to different degrees at different times. Some, for example, "prohibit[ed] … on-premises consumption of food and beverages and gatherings of more than 50 people"; others allowed it to re-open "but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out"; while yet others allowed it to "resume service for on-premises consumption" limited to "six persons or fewer … served outdoors and where each person in a party is distanced at least six feet away from any other person in any

other party." All of these orders prohibited customers from using the inside premises of TJBC's businesses.

Like Sandy Point and Bend Hotel, TJBC did not initially allege that the SARS-CoV-2 virus physically altered its property, nor did it (or could it) allege that the resulting closure orders did so. During oral argument, and for the first time in the case, TJBC's counsel shifted ground, arguing that the question is not whether the virus or the closure orders physically altered the *property*, but rather whether they physically altered the *premises*, and that the premises include the air. Because the virus altered the air, counsel argued, it altered the premises. But even if the premises included the air, the Policy specifies what it covers: "direct physical 'loss' to Covered *Property* at the 'premises,'" not direct physical loss to the premises themselves. And in any event, neither the Policy nor the dictionary suggest that the word "premises" includes air. Instead, the Policy defines "premises" only as "the Location of Premises described in the Declarations," which in turn include only a physical address. In short, even if we were to accept this last-minute change in emphasis, it would not change the result.

Turning back to its complaint, TJBC alleged only a reduced use of its property. It did not describe either a physical alteration to property nor a physical dispossession (literal or approximate), and so it has failed adequately to allege a "direct physical loss."

**IV**

To state a claim under the Policy before us, the Businesses needed to allege more than a partial loss of their preferred use of the insured properties. But they alleged neither a

physical alteration to property nor an access- or use-deprivation so substantial as to constitute a physical dispossession. They thus have not managed to state claims upon which relief could be granted.

Given this conclusion, we see no need to address the Businesses' additional claims of consumer fraud, common-law fraud, or vexatious refusal of coverage. Cincinnati could not have been fraudulent or vexatious in denying coverage where adequate grounds for coverage did not exist in the first place.

We AFFIRM the dismissals of all three cases, as well as the denials of Sandy Point's motions for reconsideration and for leave to amend its complaint.