*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0950

CREATIVE CONSOLIDATION, LLC D/B/A MASSERIA RESTAURANT, *et al.*, APPELLANTS

v.

ERIE INSURANCE EXCHANGE, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2022-CA-001109-B)

(Hon. Shana Frost Matini, Trial Judge)

(Argued February 14, 2024                    Decided March 21, 2024)

*Matthew J. Schlesinger*, with whom *Dustin Cho*, *Scott J. Levitt, Georgia Kazakis* and *Tyler Weinblatt* were on the brief, for appellants.

*George E. Reede*, with whom *Jessica E. Port* and *Bryant S. Green* were on the brief, for appellee.

*Lorelie S. Masters* and *Michael S. Levine* of Hunton Andrews Kurth, LLP filed a brief on behalf of the Medical Society of the District of Columbia as *amicus curiae*.

*Rhonda D. Orin* and *Marshall Gilinsky* of Anderson Kill P.C. filed a brief on behalf of United Policyholders as *amicus curiae*.

*Laura A. Foggan* of Crowell & Moring LLP filed a brief on behalf of The American Property Casualty Insurance Association as *amicus curiae*.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and DEAHL and SHANKER, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellants are ten restaurants and bars[1] across the District of Columbia and Virginia that closed their businesses to in-person dining in spring 2020 due to the COVID-19 pandemic. On appeal, they seek review of the trial court's dismissal of their claims for business interruption and civil authority coverage under identical "all-risk" Erie Insurance Exchange ("Erie") Ultrapack Plus insurance policies (the "Policy"). Distinguishing their arguments from those made by other area restaurants in our decision in *Rose's 1, LLC v. Erie Insurance Exchange*, 290 A.3d 52 (D.C. 2023), appellants assert that the presence of the COVID-19 virus itself, rather than municipal orders, caused "direct physical loss of or damage to Covered Property" entitling them to coverage under the Policy. We disagree and affirm the trial court's dismissal of their claims.

---

[1] Creative Consolidation, LLC (d/b/a Masseria Restaurant), Flying Donkey, LLC (d/b/a SER Restaurant), Joselito, LLC (d/b/a Joselito Casa de Comidas), Maxwell Park, Maxwell Yard (d/b/a Maxwell Park), Nussbar, LLC (d/b/a Shouk), Officina Café, LLC, Officina LLC (d/b/a, Officina by Nicholas Stefanelli), Pamplona, LLC, and Sloppy Mama's, LLC.

## I.     Background

## A.     The COVID-19 Virus

Appellants' complaint states that a person infected with COVID-19 sheds the virus onto surfaces they touch, after touching their eyes or nose, and into the air they breathe, and cites to scientific studies for the following statements about the COVID-19 virus.  With incubation periods extending up to fourteen days, people can contract the COVID-19 virus before they present with its symptoms.  Others may become infected without exhibiting symptoms at all.  Asymptomatic and pre-symptomatic individuals can still transmit the virus, and in some cases can have a higher concentration of the virus than those who are symptomatic.  Typically secreted by way of droplets or aerosol particles, the virus is particularly transmissible in indoor spaces, like restaurants or bars, where people sit in close proximity without masks.  Although cleaning surfaces can remove some of the virus, doing so does not eliminate possible transmission where the virus is present in the air or continually reintroduced by other infected people.  The virus can survive for at least seven days on common surfaces at room temperature.

### B.     Local Government COVID-19 Orders

On March 16, 2020, District of Columbia Mayor Muriel Bowser issued the first of several orders prohibiting all in-person indoor dining.  Over the next several months, additional orders by Mayor Bowser required District of Columbia restaurants to maintain six-foot distances for lines of take-out customers, regularly disinfect high-touch surfaces, and post their disinfection protocols for customers to see.  In May and June 2020, Mayor Bowser issued reopening orders that allowed restaurants to open first for outdoor dining with tables six feet apart and then for indoor dining at 5 % occupancy or below.

Virginia's Governor Ralph Northam also issued a series of executive orders affecting restaurant operation during the COVID-19 pandemic.[2]  A March 17, 2020 order restricted restaurants to ten or fewer diners, and subsequent orders limited any gathering to ten people and required the closure of restaurants.  Across phases of reopening for the state, Governor Northam issued executive orders in May and June 2020 that mandated cleaning protocols and allowed restaurants first to operate at 50% occupancy of any outdoor spaces, then 50% of indoor occupancy, and later full operation with diners seated at least six feet apart.

---

[2] Several of the restaurants among appellants are located and organized in Virginia and were thus subject to Governor Northam's executive orders.

## C.     The Policy

Appellants each purchased an "all-risks" insurance policy from Erie with start dates ranging from April 2019 to May 2020.  Each appellant purchased Erie's Ultrapack Plus Policy.  The Policy states that Erie "will pay for direct physical 'loss' of or damage to Covered Property at the premises described in the 'Declarations' caused by or resulting from a peril insured against."  The Policy defines "loss" as "direct and accidental loss of or damage to covered property."

Under its "Income Protection – Coverage 3" section, the Policy contains provisions for income-protection coverage, extra-expense coverage, and civil-authority coverage.  The income-protection provision covers "loss of 'income' and/or 'rental income' [sustained] due to partial or total 'interruption of business' resulting directly from 'loss' or damage to property on the premises described in the 'Declarations' from a peril insured against."

Similarly, the extra-expense provision covers "necessary expenses [incurred] due to partial or total 'interruption of business' resulting directly from 'loss' or damage to property on the premises described in the 'Declarations' from a peril insured against."  The Policy defines "interruption of business" as "the period of time" beginning "with the date of direct 'loss' to covered property" and lasting until "the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality."

The civil-authority coverage provision, listed under the section's "Additional Coverages," states that "[w]hen a peril insured against causes damage to property other than property at the premises described in the 'Declarations'," Erie "will pay for the actual loss of 'income' and/or 'rental income' [sustained] and necessary 'extra expense' caused by action of civil authority that prohibits access to the premises."

## D.     Trial Court Ruling

When appellants sought payment through the Policy for lost business income due to the COVID-19 pandemic, Erie denied them coverage.  Appellants then filed a complaint in Superior Court against Erie, arguing that the losses they suffered were covered under the Policy.  Appellants argued that they were unable to use their properties for their intended purpose "absent extensive repairs and remedial measures" and the "need to mitigate the threat or actual physical presence of the virus on door-handles, tables, silverware, surfaces, in heating and air conditioning systems and any other of the multitude of places the virus has or could be found."

Erie filed a motion to dismiss appellants' complaint, which the Superior Court granted.  The Superior Court reasoned that the restaurants' complaint fell short of stating plausible facts establishing that COVID-19 caused them physical damage to trigger coverage under their Erie policy.

The trial court order, which predates our decision in *Rose's 1, LLC v. Erie Insurance Exchange*, 290 A.3d 52 (D.C. 2023), also rejected the restaurants' argument that the loss of the use of their property due to the COVID-19 pandemic and associated municipal orders was covered under the policy, finding instead that a "direct physical loss" under the Policy requires "physical alteration." Given our subsequent holding in *Rose's 1* that "'[d]irect physical loss of or damage' requires a tangible, material alteration or change to covered property," *id.* at 59, appellants do not make this argument on appeal.

## II.    Discussion

We review a grant of a motion to dismiss de novo. *E.g.*, *In re Est. of Curseen*, 890 A.2d 191, 193 (D.C. 2006). Like the trial court, we accept the complaint's allegations as true and construe facts and inferences in favor of the plaintiff. *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009). To survive a motion to dismiss, a pleading must include well-pleaded factual allegations that plausibly give rise to an entitlement for relief. *Mazza v. Housecraft, LLC*, 18 A.3d 786, 790 (D.C. 2011) (adopting *Iqbal* pleading standard). Factual allegations "must be enough to raise a right to relief above the speculative level." *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP,* 68 A.3d 697, 709 (D.C. 2013) (citing *Clampitt v. Am. Univ.*, 957 A.2d 23, 29 (D.C. 2008)). At the motion to dismiss stage, the legal sufficiency of

the complaint is the only issue on review, not the merits of the plaintiff's claim. *Grayson v. AT&T Corp.*, 15 A.3d 219, 228-29 (D.C. 2011).

Any ambiguous terms in an insurance policy "are construed against the insurer and in favor of 'the reasonable expectations of the purchaser of the policy.'" *Chase v. State Farm Fire and Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001) (quoting *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996)). "Nonetheless, the reasonable expectations doctrine is not a mandate for courts to rewrite insurance policies and reallocate their assignment of risks between insurer and insured." *Id.* at 1132.

## A.    Contamination Theory

Subsequent to the trial court's order, we had occasion in *Rose's 1*, 290 A.3d at 52, to review on appeal the question of whether restaurants are entitled to insurance coverage for their loss of income during the COVID-19 pandemic under the same Erie policy. In *Rose's 1*, a group of other area restaurants appealed the trial court's grant of summary judgment to Erie, arguing that their loss of income due to the mandated COVID-19 closures was a "direct physical loss of or damage to" their property covered by the policy. *Id.* While the contamination theory was not raised by the parties in *Rose's 1*, we acknowledged that other state courts that had relied on such a theory at the motion-to-dismiss stage "require[d] 'express[] aver[ment]' that COVID-19 was present" to find that the COVID-19 virus itself caused a physical

loss. *Id*. at 64 (quoting *SWB Yankees, LLC v. CAN Fin. Corp.*, 2021 WL 3468995, at \*17 (Pa. C.P. Aug 4, 2021)). Because the appellants in *Rose's 1* did not make such an argument, we found that "without further argument and consideration, we could not say that the allegation of active presence of COVID-19 in a business constitutes 'direct physical loss or damage.'" *Rose's 1*, 290 A.3d at 64, n. 21.

Here, appellants seek to distinguish their arguments from those made by the parties in *Rose's 1* by relying on the contamination theory argument we reserved there. *Id*. Appellants allege that they suffered a "physical loss or damage" covered by the Policy because the COVID-19 virus physically altered their property. Their complaint states that the virus's droplets physically alter the chemical makeup of indoor air and that its spike proteins bind to surfaces to change their molecular makeup. Appellants contend that the facts pled in their complaint cite up-to-date scientific knowledge about the virus's form ("[d]roplet nuclei are usually smaller than 5 microns, invisible to the naked eye and remain suspended in the air ('aerosolized') for significant periods"), incubation period ("the concentration of virus in . . . pre-symptomatic individuals can be higher than the viral loads in symptomatic individuals"), and transmissibility ("[p]ersons with COVID-19 expel the COVID-19 virus as they talk, cough, sneeze, or even just breathe"; "particles [can] also be deposited by individuals infected by the COVID-19 virus when they touch surfaces after touching their eyes or nose").

Courts across the country have encountered the COVID-19 contamination theory argument under analogous insurance coverage policy provisions that we reserved in *Rose's 1* and that appellants put forth here. Appellants point us to a number of state court decisions finding that claims of "physical loss or damage" from the COVID-19 virus itself similar to those made in their complaint were sufficient at the pleading stage.[3]

However, the cases upon which appellants chiefly rely–namely, *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 287 A.3d 515, 533-34 (Vt. 2022), and *Marina Pac. Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, 81 Cal. App. 5th 96, 109 (Cal. Ct. App. 2022)–apply "extremely liberal pleading standards," *Huntington Ingalls*, 287 A.3d at 536. The *Huntington Ingalls* court's pleading standard requires plaintiffs only to give defendants notice of the claims, *id*. at 533, and the *Marina Pacific* court found that allegations were sufficient "however improbable they may be," *Marina Pac.*, 81 Cal. App. 5th at 105 (internal quotation marks omitted). The

---

[3] *See, e.g.*, *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 287 A.3d 515, 533–34 (Vt. 2022) (reversing a judgment on the pleadings because adherence of COVID-19 virus to surfaces was an "alteration" that caused plaintiff's loss); *Marina Pac. Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, 81 Cal. App. 5th 96, 109 (Cal. Ct. App. 2022) (reversing demurrer to complaint because allegation that the COVID-19 virus caused a physiochemical reaction transforming property, "even if improbable," is "unquestionably" sufficient at the pleading stage); *San Jose Sharks LLC, v. Factory Mut. Ins. Co.*, 98 Cal. App. 5th 158, 168 (Cal. Ct. App. 2023) (reversing grant of a motion to strike pleadings that the virus itself caused physical damage because plaintiffs' allegations of droplets contaminating surfaces "pass[es] muster.")

standards that both courts applied lack the plausibility requirement that characterizes our pleading standard. We require that pleadings "be enough to raise a right to relief above the speculative level." *Chamberlain v. Amer. Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C. 2007) (internal quotation marks omitted). "Bare allegations of wrongdoing that are no more than conclusions 'are not entitled to the assumption of truth' and are insufficient to sustain a complaint." *Logan v. LaSalle Bank Nat. Ass'n*, 80 A.3d 1014, 1019 (D.C. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Additionally, the cases where courts have accepted contamination theory arguments for the COVID-19 virus are far outweighed by those where courts have rejected them with alleged facts similar to those at issue here under our plausibility standard at the motion-to-dismiss stage, *see, e.g.*, *George Washington Univ. v. Factory Mut. Ins. Co.*, 626 F. Supp. 3d 8, 14 (D.D.C. 2022) ("the overwhelming majority of courts that have considered the question have held that COVID-19 does not materially alter the property it touches"), or the summary-judgment stage, *see, e.g.*, *Schleicher & Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*, 302 A.3d 67, 77 (N.H. 2023) ("the presence of SARS-CoV-2 in the air at the property is not relevant to the question of whether there has been 'physical loss of or damage to property,' because the policies insure property, not people").

Appellants also argue that the efforts they expended to replace or repair property items further support their claim that the virus caused a physical alteration to their premises. Drawing on the Policy's definition of "interruption of business" as ending when "covered property should be repaired, rebuilt, or replaced," appellants allege that they were "prevented from operating by . . . the need to repair, remediate or replace property so damaged or lost." But appellants do not provide details in an otherwise thorough complaint on any such repairs beyond needing to "mitigate the threat or actual physical presence of the virus on door-handles, tables, silverware, surfaces, [and] in heating and air conditioning systems[.]" Nor do they offer any alleged facts about the specific damage done by the virus to their *property*; their complaint focuses instead on the dangers to people coming into contact with that property. Taking them as true, we find that the complaints' allegations of damage here, which present almost no particulars beyond conclusory statements that physical alteration occurred, do not state a plausible claim for "direct physical loss of or damage" to covered property under our pleading standards for surviving a motion to dismiss.[4] *Chamberlain*, 931 A.2d at 1023.

---

[4] We note that appellants also argue that the absence of a virus exclusion in the Policy, an exclusion that was present in other Erie policies, suggests that the COVID-19 virus falls within the Policy's coverage scope. We found in *Rose's 1*, however, that "[a]lthough the Policy here does not include a specific virus or pandemic exclusion, no other clause extends coverage to loss of use absent a physical impediment to the property." *Rose's 1,* 290 A.3d at 63. Because we decline to hold that appellants' contamination theory arguments, based on their pleadings,

## B.    Noxious Substances

We are also not persuaded by appellants' argument that the COVID-19 virus damages property in the same way that noxious substances do, which some courts have held caused the type of damage entitling policyholders to coverage.  Appellants cite to cases from other jurisdictions where courts have held that noxious substances like odors or gases have caused a physical loss or damage to covered property. Appellants maintain that their COVID-19 contamination argument is a natural extension of longstanding precedent.  *See, e.g.*, *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, at \*6 (D.N.J. Nov. 25, 2014) (ammonia gas); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (en banc) (gasoline vapor); *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (asbestos); *Or. Shakespeare Festival Assoc. v. Great Amer. Ins. Co.*, 2016 WL 3267247, at \*5 (D. Or. June 7, 2016) (wildfire smoke), *vacated by stipulation*.

In particular, appellants emphasize courts' reasoning that such non-tangible threats still have "physical properties [that] cannot reasonably be disputed." *Or. Shakespeare*, 2016 WL 3267247, at \*5.  Like the COVID-19 virus, appellants contend, which threatens the people that touch infected surfaces or breathe infected

establish a physical impediment to their property, we similarly find that the absence of a virus exclusion does not entitle appellants to coverage under the Policy.

air, noxious substances have been found to damage property when they make "further" use of that property "highly dangerous." *W. Fire. Ins. Co.*, 437 P.2d at 55-56.

But the behavior of the COVID-19 virus, as alleged in appellants' complaint, is distinct from that of the noxious substances in the cases they cite. Most noxious substances have a more permanent physical presence: wildfire smoke leaves tangible parts of ash and soot on surfaces or in HVAC systems, *Or. Shakespeare*, 2016 WL 3267247 at *1, ammonia gas requires dry ice to neutralize its effects, *Gregory Packaging*, 2014 WL 6675934 at *1, and gasoline vapor "seep[s]" into building walls, *W. Fire. Ins. Co.*, 437 P.2d at 39. The COVID-19 virus, on the other hand, is no longer viable on most surfaces after approximately seven days,[5] meaning, barring any reintroduction, it would disappear after that time. In other words, the COVID-19 virus is unlike other noxious substances because it is ultimately self-remediating, rather than relying on an external force to remove it.

Appellants contend, and the Medical Society of the District of Columbia reiterates in its amicus brief, that the trial court improperly reasoned that the COVID-19 virus could be removed through cleaning, because it can be impervious

---

[5] In an amicus brief, The Medical Society of the District of Columbia cites scientific studies demonstrating that the COVID-19 virus can survive up to twenty-eight days at room temperature on certain surfaces. The longer viability period suggested by these studies, however, does not change the self-remediating nature of the COVID-19 virus that distinguishes the virus from other noxious substances.

to cleaning and would be consistently reintroduced. However, the fact that the COVID-19 virus could be reintroduced by diners even after cleaning does not affect the distinction between the virus's characteristics as a self-remediating substance and the characteristics of other noxious substances. Appellants also argue that the trial court was incorrect in finding that the Policy required damage to be more than temporary. But it is not the inherently temporary nature of the COVID-19 virus's presence on substances that precludes appellants from coverage; rather, it is the virus's self-remediation, which suggests that it does not cause physical harm to property as other noxious substances might.

Moreover, appellants' attempts to characterize the COVID-19 virus as a noxious substance entitling them to insurance coverage is further belied by a reliance on reasoning that would contradict our own precedent. The noxious substance cases appellants cite reason that a "loss of use" could be a physical damage or loss to insurance-covered property. *Or. Shakespeare*, 2016 WL 3267247, at \*5 (rejecting the argument that a physical loss or damage must be "structural"); *W. Fire Ins. Co.*, 165 Colo. at 38 ("loss of use" that is "viewed in proper context" can establish a physical loss or damage); *Gregory Packaging*, 2014 WL 6675934, at \*5 (rejecting an interpretation of "physical loss or damage" as requiring a physical alteration). We have, however, rejected the conclusion that a "loss of use" can satisfy the language of the Policy requiring a "physical loss of or damage"; instead, we have

held that the language of the Policy requires policyholders to establish a "tangible, material alteration or change to covered property." *Rose's 1*, 290 A.3d at 59.

### C.    Civil Authority Coverage Claim

Appellants also appeal the trial court's dismissal of their claim for coverage under the Policy's Civil Authority provision, contending that their pleadings satisfy the requirements laid out in the Policy's Civil Authority provision text.  However, the language of the Civil Authority provision—"*a peril insured against*" (emphasis added)—makes clear that such coverage extends only to those policyholders that successfully establish a direct physical loss of or damage to covered property. Without "direct physical loss or damage" to covered property, there is no trigger for the Civil Authority provision's coverage, which is "premised on the occurrence of a 'peril insured against.'" *Sanzo Enters., LLC v. Erie Ins. Exch.*, 182 N.E.3d 393, 401 (Ohio Ct. App. 2021) (discussing the same Erie policy).  Because appellants do not establish a direct physical loss or damage, they are not entitled to coverage under the Policy's Civil Authority provision and no further analysis is required.

### III.    Conclusion

We have great sympathy for the losses suffered by appellants during the sudden and extraordinary global COVID-19 pandemic.  But under the terms of the

Policy, we conclude that the COVID-19 virus did not cause a tangible change or alteration to the appellants' property, required under the Policy to establish a "direct physical loss of or damage" entitling them to insurance coverage. Further, appellants' complaint did not allege sufficient factual allegations to "raise a right to relief above the speculative level." *Pietrangelo*, 68 A.3d at 709. Thus, we affirm the trial court's grant of Erie's motion to dismiss.

*So ordered.*