NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2022-0155

SCHLEICHER AND STEBBINS HOTELS, LLC & a.

v.

STARR SURPLUS LINES INSURANCE COMPANY & a.

Argued: November 10, 2022
Opinion Issued: May 11, 2023

Rath Young and Pignatelli, P.C., of Concord (Michael S. Lewis and Michael K. O'Neil on the brief), and Anderson Kill, P.C., of New York, New York (Marshall Gilinsky and Ethan W. Middlebrooks on the brief, and Marshall Gilinsky orally), for the plaintiffs.

Primmer Piper Eggleston & Cramer PC, of Manchester (Doreen Connor on the brief and orally for all defendants), and Zelle LLP, of Framingham, Massachusetts (Matthew Gonzalez and Seth Jackson on the brief), for defendant Everest Indemnity Insurance Company.

Kennedys CMK LLP, of Basking Ridge, New Jersey (Kristin V. Gallagher and Eduardo DeMarco on the brief, and Kristin V. Gallagher orally), and Cullencollimore, PLLC, of Nashua (Kevin G. Collimore on the brief), for defendant AXIS Surplus Insurance Company.

Paul Frank + Collins, P.C., of Burlington, Vermont (Megan A. Sigur and Nolan C. Burkhouse on the brief), Robinson & Cole LLP, of Hartford, Connecticut (Wystan M. Ackerman on the brief), and Robins Kaplan LLP, of Los Angeles, California and Boston, Massachusetts (Amy Churan and Matthew P. Cardosi on the brief), for defendants Starr Surplus Lines Insurance Company and Certain Underwriters at Lloyd's and London Companies Subscribing to Policy Number EW0040519.

Sulloway & Hollis PLLC, of Concord (Alexander Henlin on the brief), and Dickinson Wright PLLC, of Phoenix, Arizona (Bennett Evan Cooper on the brief), for defendant Evanston Insurance Company.

Morrison Mahoney LLP, of Boston, Massachusetts (Michael Aylward on the brief), and Clausen Miller P.C., of Chicago, Illinois (Melinda S. Kollross on the brief), for defendant Hallmark Specialty Insurance Company.

Devine Millimet & Branch, P.A., of Manchester (Andrew Dunn and Donald L. Smith on the brief), and Phelps Dunbar LLP, of Tampa, Florida (Patricia McLean and Jay Sever on the brief), for defendant Scottsdale Insurance Company.

Vitt & Associates, PLC, of Norwich, Vermont (Geoffrey Vitt and Sarah J. Merlo on the brief), for defendant Mitsui Sumitomo Insurance Company of America.

Nixon Peabody LLP, of Manchester (David A. Vicinanzo and James Hatem on the brief), for the American Property Casualty Insurance Association, as amicus curiae.

Vrountas, Ayer & Chandler, P.C., of Manchester (Christopher T. Vrountas on the brief), and Hunton Andrews Kurth LLP, of Washington, D.C. (Michael S. Levine on the brief), for the New Hampshire Lodging & Restaurant Association, as amicus curiae.

Perez Law, of Medford, Massachusetts (Michael Perez on the brief), for the New Hampshire Medical Society, as amicus curiae.

Reed Smith LLP, of Pittsburgh, Pennsylvania (Michael A. Kostiew on the brief), for United Policyholders, as amicus curiae.

HICKS, J. This interlocutory appeal is from an order of the Superior Court (Kissinger, J.) granting the motion for partial summary judgment filed by the plaintiffs, Schleicher and Stebbins Hotels, LLC, Renspa Place LLC, Chelsea Gateway Property LLC, OS Sudbury LLC, Monsignor Hotel LLC, SXC Alewife Hotel LLC, Lawrenceville, LLC, Second Avenue Hotel Lessee LLC, Second Avenue Hotel Owner LLC, Medford Station Hotel LLC, WDC Concord Hotel LLC, Broadway Hotel LLC, Fox Inn LLC, Melnea Hotel LLC, Natick Hotel Lessee LLC, Superior Drive Hotel Owner LLC, Arlington Street Quincy Hotel LLC, Albany Street Hotel Lessee, LLC, Albany Street Hotel, LLC, Cleveland Circle Hotel Lessee LLC, Cleveland Circle Hotel Owner LCC, Worcester Trumbull Street Hotel, LLC, Assembly Hotel Operator LLC, Assembly Row Hotel LLC, Parade Residence Hotel LLC, Portwalk HI LLC, Route 120 Hotel LLC, Vaughn Street Hotel LLC, and FSG Bridgewater Hotel LLC; denying the cross-motion for summary judgment filed by the defendants, Starr Surplus Lines Insurance Company, Certain Underwriters at Lloyd's and London Companies Subscribing to Policy Number EW0040519, Everest Indemnity Insurance Company, Hallmark Specialty Insurance Company, Evanston Insurance Company, AXIS Surplus Insurance Company (AXIS), Scottsdale Insurance Company, and Mitsui Sumitomo Insurance Company of America; and granting defendant AXIS' motion for partial summary judgment. See Sup. Ct. R. 8.

The three questions presented on appeal are: (1) under Mellin v. Northern Security Insurance Co., 167 N.H. 544 (2015), does the presence of

SARS-CoV-2 in the air or on surfaces at a premises, if proven, satisfy a requirement under a property insurance policy of "loss or damage" or "direct physical loss of or damage to property"; (2) does the "mold, mildew & fungus" clause and microorganisms exclusion endorsement in the policies unambiguously preclude coverage for the plaintiffs' claimed losses; and (3) does the pollutants and contaminants exclusion in defendant AXIS' policy unambiguously preclude coverage for the plaintiffs' claimed losses?  We answer question (1) in the negative and hold that the presence of SARS-CoV-2 in the air or on surfaces at a premises, if proven, does not satisfy a requirement under a property insurance policy of "loss or damage" or "direct physical loss of or damage to property" under Mellin, 167 N.H. 544, and decline to answer questions (2) and (3).

I.  Facts

We accept the statement of the case and facts as presented in the interlocutory appeal statement and the trial court order, and rely upon the record for additional facts as necessary.  See State v. Hess Corp., 159 N.H. 256, 258 (2009).

The plaintiffs own and operate twenty-three hotels.  Four are located in New Hampshire, eighteen in Massachusetts, and one in New Jersey.  The plaintiffs purchased $600 million of insurance coverage from the defendants for the policy period from November 1, 2019 to November 1, 2020.  Each insurance company accepted a specific share of the risk, as described in the policies at issue.  With the exception of certain addenda, the relevant language of the policies is identical.  Each policy states, in part, that it "insures against risks of direct physical loss of or damage to property described herein . . . except as hereinafter excluded."

On January 9, 2020, the World Health Organization (WHO) first identified the SARS-CoV-2 virus, which is responsible for causing COVID-19.  Soon thereafter, COVID-19 became a pandemic, and all fifty states adopted public health measures to control its spread.  Beginning in March 2020, the governors of New Jersey, Massachusetts, and New Hampshire issued various orders requiring citizens to stay home or in their places of residence unless engaged in a limited number of enumerated activities, and orders restricting the operations of the hotels.  Each of these orders, as the trial court found, was issued in an attempt to control the spread of COVID-19, which primarily spreads "when an infected person is in close contact with another person" (quotations omitted).  Although most infections are caused through close contact, the United States Centers for Disease Control and Prevention has determined that airborne transmission can occur under special circumstances, such as those involving prolonged exposure to respiratory particles, enclosed spaces, or areas with inadequate ventilation or air handling.  In addition,

4

"fomite transmission" can occur generally when infectious viral particles land on a surface and a person touches the contaminated surface, and then touches his or her mouth or nose. While fomite transmission has been considered a potential mode of COVID-19 transmission, there are no specific reports which have directly demonstrated that it has occurred.

For periods of time, pursuant to the governors' orders, hotels in each of the three states were permitted to provide lodging only to vulnerable populations and to essential workers. These essential workers included healthcare workers, the COVID-19 essential workforce, and other workers responding to the COVID-19 public health emergency. Beginning in June 2020, the plaintiffs' hotels were permitted to reopen with a number of restrictions on their business operations.

In or about March 2020, the plaintiffs, through their insurance broker, provided notice to the defendants that they were submitting claims in connection with losses stemming from COVID-19. In May and June 2020, several defendants sent letters to plaintiffs identifying relevant policy provisions, requesting additional information, and reserving their rights to deny coverage pending the ongoing claim investigation. On June 19, 2020, the plaintiffs filed suit in superior court, seeking a declaratory judgment that they are contractually entitled to insurance coverage for business interruption losses resulting from the COVID-19 pandemic. The complaint asserted that "[t]he property damage and orders of civil authority associated with the coronavirus have caused Plaintiffs to sustain tens of millions of dollars in business income losses," and that "[t]hese losses are covered under the insurance policies that Plaintiffs purchased from Defendants." The plaintiffs sought coverage under the policies' business interruption losses provision, set forth in paragraph 10 of the policies, and under extension of time element coverage provisions set forth in paragraph 21 of the policies. Both the business interruption and extension of time element coverage provisions insure against the loss of business income caused by loss, damage or destruction of property. The extension of time element coverage provisions, in certain circumstances, insure against actual losses sustained by the insured when loss or damage to property occurs at the premises of third parties.

On November 23, 2020, the plaintiffs moved for partial summary judgment, requesting that the superior court find that, under New Hampshire law, any requirement under the policies of "loss or damage" or "direct physical loss of or damage to property" is met when the property is impacted by COVID-19, and that the court strike various affirmative defenses from the defendants' answers, each of which concerns the plaintiffs' alleged failure to sufficiently establish "loss or damage" to property. The plaintiffs argued that the "extremely broad extensions of coverage . . . cover business interruption losses resulting from an array of circumstances involving events at the Hotels as well

5

as events away from the Hotels." The plaintiffs did not seek a "factual determination of whether there has been loss or damage to <u>specific</u> property at the Hotels or elsewhere."

On January 22, 2021, the defendants filed a cross-motion for partial summary judgment in which they argued that impacts to the operations of the hotels from COVID-19 do not trigger any provision of the policies without a showing of direct physical loss of or damage to property. Defendant AXIS filed an additional motion for summary judgment arguing that the pollution exclusion contained in its policy unambiguously excludes coverage for loss or damage caused or aggravated by the spread of COVID-19.

On June 15, 2021, the trial court issued an order which, in relevant part, addressed the questions presented in this interlocutory appeal. Thereafter, the defendants, other than AXIS, sought leave to take an interlocutory appeal of two of the issues addressed in the trial court's order, which the trial court granted. The plaintiffs then successfully moved for leave to include in the interlocutory appeal that portion of the trial court's order finding that the pollutants and contaminants exclusion in defendant AXIS' policy unambiguously precludes coverage for the plaintiffs' claimed losses. We accepted all three questions.

## II. <u>Discussion</u>

We review <u>de</u> <u>novo</u> a summary judgment decision on questions of insurance policy interpretation because "[t]he interpretation of insurance policy language, like any contract language, is ultimately an issue of law for the court to decide." <u>Peerless Ins. v. Vt. Mut. Ins. Co.</u>, 151 N.H. 71, 72 (2004). "The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties. To discern the parties' intent, we begin with an examination of the insurance policy language." <u>Santos v. Metro Prop. & Cas. Ins. Co.</u>, 171 N.H. 682, 685-86 (2019) (citation omitted). In interpreting policy language, we look to the plain and ordinary meaning of the policy's words in context. <u>Russell v. NGM Ins. Co.</u>, 170 N.H. 424, 428 (2017). We construe the terms of the policy as would a reasonable person in the position of the insured based upon more than a casual reading of the policy as a whole. <u>Id</u>. This standard is objective. <u>Id</u>. If more than one reasonable interpretation is possible, and one of them provides coverage, the policy contains an ambiguity and will be construed against the insurer. <u>Carter v. Concord Gen. Mut. Ins. Co.</u>, 155 N.H. 515, 517 (2007). However, the fact that the parties disagree on the interpretation of a term or clause in an insurance policy does not necessarily create an ambiguity. <u>Bartlett v. Commerce Ins. Co.</u>, 167 N.H. 521, 531 (2015). For an ambiguity to exist, the disagreement must be reasonable. <u>Id</u>.

6

A.  Relevant Policy Language

With these principles in mind, we consider the language of the commercial property insurance policies relevant to the first question presented, in the context of the policies as a whole.  Although the term "all-risk" is not used in the policies, the plaintiffs assert that the policies are "all-risk" policies, a point the defendants do not dispute.  "All-risk" policies typically cover "any risk of direct physical loss or damage that is not specifically excluded or limited by the terms of the policy."  Russell, 170 N.H. at 429 (quotation omitted).  However, "all-risk" does not mean "every risk." 10A Couch on Insurance 3d § 148:50 (rev. ed. 2016).  For coverage to be found, some actual loss or damage, within the meaning of the policy, must actually have occurred.  Id.; Verveine Corp. v. Strathmore Insurance, 184 N.E.3d 1266, 1273 (Mass. 2022).

In addition to providing coverage for the insured's real and personal property, subject to certain exclusions, the policies provide business interruption coverage.  The business interruption coverage provision, found at paragraph 10 of the policies, is a time element coverage provision.  See Tapestry, Inc. v. Factory Mutual Insurance Co., 286 A.3d 1044, 1049, n.6 (Md. 2022) ("time element coverage is sometimes referred to as business interruption or business income loss coverage").  It protects against the consequence of the loss, not the damage to the property itself.  11A Couch on Insurance 3d § 167:1 (rev. ed. 2017).  The business interruption provision states, in relevant part:

> this policy shall cover the loss resulting from the complete or partial interruption of business conducted by the Insured including all interdependent loss of earnings between or among companies owned or operated by the Insured caused by loss, damage, or destruction <u>by any of the perils covered herein</u> during the term of this policy to real and personal property as covered herein.

(Emphasis added.)  The "Perils Insured Against" provision, at paragraph 28 of the policies, in turn, provides:

> This policy insures against risks of direct physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded.

Accordingly, under paragraph 10 of the policies, the insureds may recover losses arising from an inability to continue normal business operations due to a "direct physical loss of or damage to property" covered by the policies.

7

The policies also include a provision that defines the length of time a loss can be claimed under the time element coverage provisions. That provision, at paragraph 20 of the policies, reads:

> Loss Provisions Applicable to Time Element Coverage – The "Period of Restoration" (including but not limited to business interruption, extra expense, contingent business interruption, contingent extra expense, soft costs, rental value/Income, leasehold interest, royalties, etc.) is defined as the length of time for which loss may be claimed, and shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this policy, subject to the following provisions:
>
> a) The Period of Restoration shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss, including such time as may be required to restore or recreate physically lost, damaged or destroyed valuable papers and records or media and data.
>
> b) With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly the Period of Restoration shall be determined as provided above but such determined length of time shall be applied and the loss hereunder calculated from the date that business operations would have begun had no damage or destruction occurred.
>
> c) The Period of Restoration shall include such additional length of time to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:
>
>> i) the date on which the liability of the Company for loss or damage would otherwise terminate; or
>> ii) the date on which repair, replacement, or rebuilding of such part of the property as has been damaged is actually completed;
>
> terminating no more than 365 days from the later commencement date.

In addition, the policies include, at paragraph 21, "Extensions of Time Element Coverage" provisions (ETEC provisions). Paragraph 21 states, in relevant part, that the policy

8

insures against ACTUAL LOSS SUSTAINED by the Insured <u>resulting from loss or damage from the perils insured against</u>, to:

a) Any service provider's property, including but not limited to, electrical equipment and systems, water, gas, steam, telephone or their respective transmission and distribution lines or utility plants which directly provide incoming or outgoing services to the Insured situated on or outside of the insured's premises. This also includes but is not limited to property, facilities or piping systems which prevent the insured from discharging [its] outgoing effluence. This coverage is extended to include loss or damage and loss of usable service due to or resulting from any accidental occurrence to property referenced in this clause.

b) property that directly prevents a supplier (of any tier) of goods and/or services to the Insured from receiving their goods and/or services, or property that prevents a receiver (of any tier) of goods and/or services from receiving the Insured's goods and/or services; such supplier or receiver shall not be an insured under this policy. Coverage includes loss or damage to real and personal property located at Attraction properties, defined as properties not operated by the Insured, which attract potential customers to the vicinity of the Insured's locations.

c) dams, reservoirs, or equipment connected therewith when water, used as a raw material or used for power or for other manufacturing purposes, stored behind such dams or reservoirs is released from storage and causes an interruption of business as a result of lack of water supply from such sources.

d) the actual loss sustained for a period not to exceed ninety (90) consecutive days when, <u>as a result of a peril insured against</u>, access to real or personal property is impaired or hindered by order of civil or military authority irrespective of whether the property of the Insured shall have been damaged.

e) the actual loss sustained for a period not to exceed ninety (90) consecutive days when, <u>as a result of a peril insured against</u>, ingress to or egress from real or personal property is thereby impaired or hindered irrespective of whether the property of the Insured shall have been damaged.

f) Use of Water – This policy is extended to insure loss sustained during the period of time when, as a result of a physical loss or damage by a peril not excluded by this policy, recreational use of water from lakes, rivers, or other bodies is impaired or hindered.

g)  Notwithstanding the fact that the management fees will be paid from one entity part of the Named Insured to another entity part of the Named Insured, it is understood and agreed that these fees will be accepted by the insurer as an insurable item.

(Emphases added.)  The plaintiffs assert that they are entitled to coverage under subparagraphs (b) (the contingent business interruption provision), (d) (the civil authorities provision), and (e) (the ingress/egress provision).  The defendants argue that the relevant provisions of the policies all require loss or damage resulting from a "peril insured against," which is defined as "direct physical loss of or damage to property" at either the insured premises or the specified non-insured premises, and that the presence of SARS-CoV-2 within a building does not constitute "direct physical loss of or damage to property."

B.  <u>Coverage under the business interruption provision and the extension of time element coverage provisions of the policies is triggered only by "direct physical loss of or damage to" property</u>

The plaintiffs, relying on the ETEC provisions at paragraph 21, argue: (1) that they are entitled to coverage under the policies if they are able to prove that SARS-CoV-2 was present in the air at their hotels or on the surfaces of property at their hotels, or if they can prove that SARS-CoV-2 was present on "property away from the Hotels" that "wholly or partially has prevented . . . potential customers from receiving the Hotels' goods or services"; and (2) that the extension of time element coverage provisions are triggered by "loss or damage to property," and that "physical loss" is not required.  The trial court did not address whether "physical loss" is required to trigger coverage under the ETEC provisions.  Rather, the trial court concluded that the "Policies' use of the terms 'loss or damage' and 'direct physical loss of or damage to property' encompasses the kind of damage caused by the spread of SARS-CoV-2 to the Plaintiffs' properties."

To simplify our analysis regarding the coverage question presented in this appeal, we address this question at the outset.  We note that the introductory language of the ETEC provisions states that the policy "insures against ACTUAL LOSS SUSTAINED by the Insured resulting from loss or damage <u>from the perils insured against</u>, to:" properties described in (a) through (g).  "Perils insured against" is defined in the policies at paragraph 28 as, "risks of direct physical loss of or damage to property."  Accordingly, the plain language of the ETEC provisions requires that there be "direct physical loss of or damage to property" for there to be coverage under subparagraphs (a) through (g).  This "physical loss of or damage to property" must occur either at the premises of the insured, or at the premises of certain third parties.

10

We disagree with the plaintiffs that the use of the words "physical loss or damage" in subparagraph 21(f) supports a different interpretation. The plaintiffs point out that subparagraph (f) states, "This policy is extended to insure loss sustained during the period of time when, as a result of a physical loss or damage by a peril not excluded by this policy, recreational use of water from lakes, rivers, or other bodies is impaired or hindered." The plaintiffs argue that, if the defendants had wanted "physical loss or damage to property" to be a requirement for coverage under subparagraphs (b), (d), and (e), they would have included the words "physical loss or damage" in those subparagraphs, as they did in (f). The plaintiffs argue that reading (b), (d), and (e) to require physical loss or damage would render the use of those words in (f) surplusage. As a general matter, we will not presume language in a contract to be mere surplusage. Progressive N. Ins. Co. v. Argonaut Ins. Co., 161 N.H. 778, 782 (2011). In addition, we typically construe insurance policies in the same manner as we do other contracts. Tech-Built 153 v. Va. Surety Co., 153 N.H. 371, 375 (2006). However, as the defendants argue, we must be cautious when we apply this interpretive canon to insurance policies, where "redundancies abound." Ardente v. Standard Fire Ins. Co., 744 F.3d 815, 819 (1st Cir. 2014) (quotation omitted). Reading paragraph 21 as a whole, we conclude that the inclusion of the language "physical loss or damage" in subparagraph (f) is redundant with the language "resulting from loss or damage from the perils insured against" in the first sentence of paragraph 21, just as the use of the phrase "as a result of a peril insured against" in subparagraphs (d) and (e) is. In these circumstances, we decline to apply the surplusage canon to conclude, as the plaintiffs assert, that "physical loss or damage to property" is not a requirement for coverage under subparagraphs (b), (d), and (e).

C. <u>The presence of SARS-CoV-2 on property, whether by aerosolized particles suspended in the air, or by fomites that come to rest on surfaces, does not cause "direct physical loss of or damage to property"</u>

We have not had occasion to consider the meaning of "direct physical loss of or damage to" in the context of an "all-risk" commercial property insurance policy. The plaintiffs argue that our decision in <u>Mellin</u>, 167 N.H. at 550, in which we interpreted the meaning of the term "physical loss" used in a homeowner's insurance policy, establishes the standard applicable in this case, and that the trial court correctly applied the <u>Mellin</u> standard when it concluded that the presence of SARS-CoV-2 constitutes "direct physical loss of or damage to property." See <u>Mellin</u>, 167 N.H. at 550. The defendants agree that <u>Mellin</u> provides the applicable standard, but argue that the trial court misapplied the standard.

11

The plaintiffs in <u>Mellin</u> sought to recover under their homeowner's policy after their condominium was significantly affected by a cat urine odor emanating from a unit below. <u>Id</u>. at 545. The insureds and their tenant temporarily moved out of the unit at different times due to the odor. <u>Id</u>. Remediation proved unsuccessful; the plaintiffs ultimately sold the condominium and claimed that the sales price was reduced because of the odor. <u>Id</u>. at 546. The plaintiffs brought a declaratory judgment action against their insurer, asserting that the insurer was required to reimburse them for losses to their condominium caused by the cat urine odor. <u>Id</u>. at 545. The policy at issue "insure[d] against risk of direct loss to property . . . if that loss is a <u>physical loss to property</u>." <u>Id</u>. at 546 (quotations omitted).

The trial court granted summary judgment to the insurer after finding that the cat urine odor did not satisfy the "physical loss" requirement, and the homeowners appealed. <u>Id</u>. We vacated that ruling, noting that while some jurisdictions had adopted a limited interpretation of "physical loss," others recognized that an insured may suffer a "physical loss" in the absence of structural damage to property. We held that:

> [P]hysical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage. These changes, however, must be distinct and demonstrable. Evidence that a change rendered the insured property temporarily or permanently unusable or uninhabitable may support a finding that the loss was a physical loss to the insured property.

<u>Id</u>. at 550.

While we adopted a "distinct and demonstrable alteration" standard in <u>Mellin</u>, we did not hold that the odor of cat urine in the property was necessarily sufficient to meet that standard. <u>Id</u>. at 551. Rather, we remanded the case for the application of that standard. <u>Id</u>. We also cautioned that "the term 'physical loss' should not be interpreted overly broadly," and cited a federal appeals court decision recognizing that direct physical loss or damage cannot be interpreted to apply "'whenever property cannot be used for its intended purpose.'" <u>Id</u>. at 549 (quoting <u>Pentair v. American Guarantee and Liability Ins.</u>, 400 F.3d 613, 616 (8th Cir. 2005) (emphasis omitted)).

The plaintiffs argue that the presence of SARS-CoV-2 on property, whether by aerosolized particles suspended in the air, or by fomites that come to rest on surfaces, alters property that is safe and usable into property that is dangerous and unusable. According to the plaintiffs, this alteration is "distinct" because anyone presented with property that is contaminated with

12

SARS-CoV-2 and other property that is not would choose the latter. The plaintiffs assert that the alteration is "demonstrable" through testing and modeling used to identify where the virus is present. The trial court agreed with the plaintiffs that the change to the property was "distinct" because people coming into contact with property exposed to the virus results in a risk of contracting a deadly disease.

The fact that the property could become a vector for transmission of a virus that poses a risk to human health due to the presence of SARS-CoV-2 in the air at the property is not relevant to the question of whether there has been "physical loss of or damage to property," because the policies insure property, not people. "[T]he danger of the virus is to people in close proximity to one another, not to the real property itself." Colectivo Coffee Roasters v. Society Ins., 974 N.W.2d 442, 448 (Wis. 2022) (quotation omitted). As one court observed, SARS-CoV-2 "presents a mortal hazard to humans, but little or none to buildings which remain intact and available for use once the human occupants no longer present a health risk to one another." Kim-Chee LLC v. Philadelphia Indemnity Insurance, 535 F. Supp. 3d 152, 161 (W.D.N.Y. 2021), aff'd., No. 21-1082-cv, 2022 WL 258569 (2d Cir. Jan. 28, 2022); see Wellness Eatery La Jolla v. Hanover Insurance, 517 F. Supp. 3d 1096, 1106 (S.D. Cal. 2021) ("[T]he virus harms human beings, not property.").

As the amicus brief filed by the New Hampshire Medical Society makes clear, "it is undisputed that airborne—not surface—transmission is the primary transmission vector for SARS-CoV-2." SARS-CoV-2 "harms people who breathe indoor air into which an infected person has exhaled SARS-CoV-2 droplets and infectious aerosols." However, assuming, as we must at this stage of the proceedings, that surface transmission poses a serious threat to human health, we conclude that the fact that property contaminated with SARS-CoV-2 is different from property not contaminated with SARS-CoV-2 does not make the alteration to the property "distinct," because the question is not whether the property is distinct from other property, but whether the property itself has changed. While a "distinct and demonstrable" physical alteration need not necessarily be visible and alterations at microscopic levels might in certain circumstances meet this threshold, the mere adherence of molecules to surfaces does not alter the property in a distinct and demonstrable manner. Columbiaknit, Inc. v. Affiliated FM Ins. Co., No. Civ. 98-434-HU, 1999 WL 619100, at *6 (D. Or. Aug. 4, 1999) (finding that when clothing must be cleaned to remediate an odor and cannot be sold as new, there is covered property damage, but that when "a mere washing" would remove odor from a piece of clothing whose newness was not part of its value, there was no "distinct and demonstrable" damage to property). As has been noted by a number of courts, the virus can be cleaned from surfaces, and it eventually disintegrates on its own. See, e.g., Sandy Point Dental, P.C. v. Cincinnati Ins. Co., 20 F.4th 327, 335 (7th Cir. 2021) (finding SARS-CoV-2 "may be wiped off

13

surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days"); Verveine Corp., 184 N.E.3d at 1276 ("Evanescent presence of a harmful airborne substance [like SARS-CoV-2] that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property."); Sweet Berry Café, Inc. v. Society Insurance, 193 N.E.3d 962, 974 (Ill. App. Ct. 2022) ("[U]nlike a noxious gas, for example, the virus's presence is easily remediated by routine, not specialized or costly, cleaning and disinfecting or will die off after a few days . . . ."); see also OTG Management PHL v. Employers Ins. Co. of Wausau, 557 F. Supp. 3d 556, 569-70 (D.N.J. 2021), appeal filed, No. 21-2813 (3d Cir. Sept. 28, 2021). Accordingly, the virus' presence on the surface of property cannot be said to have changed the property in a distinct and demonstrable way. Accepting for the purposes of this appeal that, as the plaintiffs assert, the virus can linger on surfaces for as long as 28 days, the fact that the virus will eventually dissipate on its own is significant to the question of whether the property has been changed in a distinct and demonstrable way. Property that has been changed in a distinct and demonstrable way will not be changed back simply by the passage of time. Cf. Cosmetic Laser, Inc. v. twin City Fire Insurance, 554 F. Supp. 3d 389, 407 (D. Conn. 2021) ("It would be odd indeed if one could simply wait several days for a 'physical structural alteration' to resolve itself."); Neuro-Communication Services, Inc. v. Cincinnati Ins. Co., __ N.E.3d __, __ 2022 WL 17573883, at *6 (Ohio Dec. 12, 2022) ("the mere existence of Covid particles on Covered Property does not involve any physical alteration of the property").

Our conclusion that the presence of SARS-CoV-2 in the air or on surfaces at a premises would not satisfy a requirement under a property insurance policy of "direct physical loss of or damage to property" is consistent with the conclusions of an "overwhelming majority of federal and state courts construing language similar or identical to the language contained in the policies at issue," Conn. Dermatology v. Twin City Fire Ins., 288 A.3d 187, 194-95 n.11 (Conn. 2023) (making statement and citing cases). In so concluding, we do not, as the plaintiffs suggest, "replace" the standard set forth in Mellin with an "[u]nsound and unclear 'cleaning test'" because our conclusion is not inconsistent with Mellin. (Quotation omitted.) The plaintiffs argue that the smell of cat urine also "affects people not property," and that this case is therefore indistinguishable from Mellin. It is true that, in Mellin, we recognized that contamination of a structure that seriously impairs or destroys its function may qualify as a direct physical loss. Mellin, 167 N.H. at 550. One of the cases we cited was Western Fire Insurance Co. v. First Presbyterian Church, 437 P.2d 52 (Colo. 1968), which was the first American case to reach this conclusion. See Scott Johnson, What Constitutes Physical Loss or Damage in a Property Insurance Policy?, 54 Tort Trial & Ins. Prac. L. J. 95, 100-01 (2019). We also cited a number of cases decided since Western Fire in which courts have found "direct physical loss" where the intrusion of

14

contaminants such as mold, bacteria, odor, or noxious gases renders a building unfit for occupancy due to health risks. Mellin, 167 N.H. at 550; Johnson, supra at 114-21. In each case, there were allegations of persistent contamination that rendered the structure unusable or uninhabitable. Yale University v. Cigna Ins. Co., 224 F. Supp. 2d 402, 412-13 (D. Conn. 2002) (asbestos and lead contamination); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America, No. 12-CV-04418, 2014 WL 6675934, at *3, *6 (D.N.J. Nov. 25, 2014) (release of ammonia); Western Fire Ins. Co., 437 P.2d at 54 (gasoline vapors); Farmers Ins. Co. v. Trutanich, 858 P.2d 1332, 1334-35 (Or. Ct. App. 1993) (odor from methamphetamine lab infiltrating house).

Similarly, the property at issue in Mellin was contaminated by a toxic cat-urine odor that originated outside of the property and that was persistent, and there was evidence presented at the summary judgment stage suggesting that this condition rendered the structure uninhabitable. See Mellin, 167 N.H. at 545-46. The town's building/health inspector examined the unit and sent the property owners a letter stating that a health problem existed at the property, and that the owners would need to move out of the apartment temporarily so that a company could terminate the odor. Id. The odor had not been successfully remediated after several months. Id. What distinguishes the present case from Mellin is that in Mellin, cat urine saturated the materials of the building in which the plaintiffs' condominium unit was located. Efforts to remediate the smell in the plaintiffs' condominium unit proved unsuccessful, suggesting that evidence might have been presented at trial to establish that the toxic odor in the plaintiffs' condominium would only have been successfully eradicated by replacing the saturated materials in the unit in which the cats resided, and that in the absence of this remediation, the condominium unit might have been rendered uninhabitable. By contrast, in this case, as we have noted, the presence of the virus on the plaintiffs' properties or on property which might have triggered coverage under the ETEC provisions could be eradicated by cleaning the property itself, and would otherwise dissipate on its own. Furthermore, the plaintiffs' response to an inquiry from McLarens, the designated loss adjuster for the claims made under the policies, indicates that some of the hotels were open to essential workers and self-quarantining individuals, and that, in fact, individuals with COVID-19 were self-quarantining at the hotels, and that essential workers were staying there, with precautions. While the presence of the virus might affect how people interact with one another, and interact with the property, it does not render the property useless or uninhabitable, see United Talent Agency v. Vigilant Ins. Co., 293 Cal. Rptr. 3d 65, 79 (Ct. App. 2022), nor distinctly and demonstrably altered.

As we must read each policy as a whole, Russell, 170 N.H at 428, we note that the period of restoration provision, found at paragraph 20 of each of the policies, reinforces the conclusion that the presence of SARS-CoV-2 at the

plaintiffs' properties, or on property which might have triggered coverage under the ETEC provisions, did not arise from a "physical loss." The period of restoration provision describes a time period during which the loss of business income shall be recovered. It is applicable to all time element coverages and governs the "length of time for which loss may be claimed." We disagree with the plaintiffs that the provision does not apply to the extensions of coverage under subparagraphs (d) and (e). As we read subparagraphs (d) and (e), together with the period of restoration provision, it is clear that those provisions simply cap the period of restoration at 90 days when the loss is due to the circumstances described in those subparagraphs.

The period of restoration provision states that the time period "shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace lost, damaged or destroyed property." (Emphasis added.) This provision assumes that any covered "direct physical loss of or damage to" property could be remedied by repairing, rebuilding, or replacing the property. Accordingly, "direct physical loss of or damage to" requires the physical act of rebuilding, repairing or replacing lost, damaged or destroyed property. See Cherokee Nation v. Lexington Ins. Co., 521 P.3d 1261, 1269 (Okla. 2022); see also Sullivan Management, LLC v. Fireman's Fund Ins. Co., 879 S.E.2d 742, 745-46 (S.C. 2022); United Talent Agency, 293 Cal. Rptr. 3d at 75; GPL Enterprise v. Certain Underwriters, 276 A.3d 75, 86 (Md. Ct. Spec. App. 2022), cert. denied, 2023 WL 1823312 (Md. Jan. 24, 2023); Terry Black's Barbeque, LLC v. State Automobile Mutual, 22 F.4th 450, 456 (5th Cir. 2022); Circle Block Partners, LLC v. Fireman's Fund Ins., 44 F.4th 1014, 1019-20 (7th Cir. 2022); Goodwill Industries v. Philadelphia Indemnity, 21 F.4th 704, 711 (10th Cir. 2021), cert. denied, 142 S.Ct. 2779 (June 6, 2022); Sandy Point Dental, 20 F.4th at 333; Oral Surgeons, P.C. v. Cincinnati Insurance Co., 2 F.4th 1141, 1144 (8th Cir. 2021); Mudpie, Inc. v. Travelers Casualty Ins. Co., 15 F.4th 885, 892 (9th Cir. 2021).

The presence of SARS-CoV-2 on the plaintiffs' properties or on property that might trigger coverage under the extension of time elements provisions, if proven, would not have required the rebuilding, repairing or replacing of property. As we have noted, routine cleaning or the passage of time eliminates the presence of the virus. We find unpersuasive the plaintiffs' argument suggesting that reading the period of restoration provision this way somehow "eliminates" coverage. It is true, as the plaintiffs point out, that subparagraph 20(c) of the policies provides up to 365 days of extended coverage as needed to restore the insured's business, not just the property, to its pre-loss condition. However, the extension does not apply if there was nothing to repair, rebuild or replace to begin with. The period of restoration provision is titled, "Loss Provisions Applicable to Time Element Coverage." As we have discussed, the time element coverage provisions are triggered only when there has been "direct physical loss of or damage to property."

16

The plaintiffs argue that the defendants' failure to rewrite their policies to require tangible changes to property following our decision in Mellin or to include a virus exclusion in the policies should lead this court to conclude that the policies cover claims arising from the presence of SARS-CoV-2 on the insured properties. The plaintiffs assert that following the SARS-CoV-1 outbreak in 2003-2004, insurance companies began to add broad virus exclusions to their policies such that "[t]he use of virus and pandemic exclusions has since become the norm, with 83% . . . of business interruption policies sold in 2020 containing an exclusion for virus, pandemic, or disease." According to the plaintiffs, in light of the fact that the defendants continued to sell policies with the same "broad coverage" and without a virus exclusion following this court's decision in Mellin, it is "only fair that this Court—like [the trial court] below—hold them to the Mellin standard and require coverage here." In support of this argument, the plaintiffs cite Providence Mutual Fire Insurance Co. v. Scanlon, 138 N.H. 301, 303-04 (1994).

In Scanlon, we declined to overrule a prior decision in which we interpreted an exclusion in an insurance policy for "bodily injury expected or intended by the insured" to apply only if the insured actually intended a particular injury. Id. at 303. In rejecting the insurance company's invitation to overrule the prior case, we stated: "[W]e believe that the insurance companies doing business in this State are best served by being able to rely on our precedents, and to use them as guidance in drafting policy provisions." Id. at 304. Scanlon does not stand for the proposition that the failure to add a virus exclusion to the policies following our decision in Mellin means that the clear and unambiguous language of the policy should be construed against the insurer. While the inclusion of a virus exclusion might have simplified the task of determining whether the plaintiffs had coverage under the policies, the language "direct physical loss of or damage to property" is unambiguous. Therefore, the absence of a virus exclusion cannot be used to contradict the contract. Cf. Holden Eng'g and Surveying, Inc. v. Pembroke Rd. Realty Trust, 137 N.H. 393, 396 (1993) (where provision in contract is unambiguous, extrinsic evidence should not have been used to contradict contract); Verveine Corp., 184 N.E.3d at 1277-78 (rejecting insured's proposed "negative implication" from the absence of an express virus exclusion in certain policies while it is included in others); Inns-by–the-Sea v. California Mut. Ins. Co., 286 Cal. Rptr. 3d 576, 593 (Ct. App. 2021) (concluding that absence of virus exclusion in the policy does not impact the meaning of "direct physical loss of or damage to" property); GPL Enterprise, 276 A.3d at 89 (concluding absence of virus exclusion does not imply the existence of coverage).

The plaintiffs also argue that New Hampshire law extends unique protection to property and its use, and that in Mellin, we "acknowledged that the ability to use property is an important consideration when evaluating the

17

scope of property insurance policies sold in this state." We did state in <u>Mellin</u> that "[e]vidence that a change rendered the insured property temporarily or permanently unusable or uninhabitable may support a finding that the loss was a physical loss to the insured property." <u>Mellin</u>, 167 N.H at 550. Our statement in <u>Mellin</u> should be understood in that context. While we have, indeed, long recognized that the right to use property is an "essential quality" of the property rights protected under New Hampshire law, <u>Eaton v. B.C. & M.R.R.</u>, 51 N.H. 504, 511 (1872), an insured's right to use its property does not operate to create coverage under an insurance policy where none exists. <u>See Santos</u>, 171 N.H. at 685-86 ("the fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties").

<u>Reversed and remanded</u>.

MACDONALD, C.J., and BASSETT and DONOVAN, JJ., concurred.